## DENINGER et ux. v. AMERICAN LOCOMOTIVE CO.

(Circuit Court of Appeals, Third Circuit. February 6, 1911.)

### No. 1,379.

1. MASTER AND SERVANT (§ 103*) — INJURIES TO SERVANT — DANGEROUS MACHINERY—CARE REQUIRED.

Where a master employs a servant to operate a complicated machine which is exceedingly dangerous unless operated in a particular manner or continuously equipped with an automatic safety appliance. the master owes a primary nondelegable duty to the servant to keep the place and the machine reasonably safe.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 175; Dec. Dig. § 103.*]

2. MASTER AND SERVANT (§ 286*) — INJURIES TO SERVANT — DANGEROUS MACHINE—NEGLIGENCE—QUESTION FOR JURY.

In an action for death of a servant by being struck by the lever of a machine, whether the master was negligent in equipping the machine with a lever instead of a wheel. and in permitting its operation without an automatic safety appliance with which it had been previously equipped. *held* for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050; Dec. Dig. § 286.*]

3. MASTER AND SERVANT (§ 265*)—PRESUMPTION OF DUE CARE.

Where decedent was struck and killed by an involuntary operation of a lever connected with a locomotive frame slot cutting machine, there was a presumption that he was in the exercise of due care when he was killed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908; Dec. Dig. § 265.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. MASTER AND SERVANT (§ 289*)—DEATH OF SERVANT—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

In an action for death of a servant by being struck by the lever of a locomotive frame slot cutting machine, evidence *held* to require submission of the issue of decedent's contributory negligence to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

5. MASTER AND SERVANT (§ 226*)—DEATH OF SERVANT—ASSUMED RISK—NEGLIGENCE OF MASTER.

While a servant assumes the ordinary risks incident to his employment, he does not assume the risk of danger resulting from the master's negligence in equipping a dangerous machine with a lever instead of a wheel and in permitting its operation without a safety device.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 659–667; Dec. Dig. § 226.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

6. DEATH (§ 55*)—PLEADING—AMENDMENT—DAMAGES.

In an action for the alleged wrongful death of a minor, the court before trial properly permitted plaintiffs to amend their statement of claim so as to allege that by reason of defendant's wrongful acts plaintiffs were caused expense of $312 for burying decedent, their son; that they also lost the benefits derived from his wages which he paid to them; and that by reason of the situation they had reasonable expectation of pecuniary profit from the continuance of his life after he arrived at age.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 72; Dec. Dig. § 55.*]

7. MASTER AND SERVANT (§ 270*)—UNSAFE APPLIANCE—EVIDENCE—PRIOR SIMILAR OCCURRENCES.

Where, in an action for the death of a servant by the involuntary operation of a lever connected with a locomotive frame slot cutting machine, defendant introduced evidence that after prior similar accidents it had substituted a wheel for the lever, which was claimed to be more safe, such evidence could not be ignored as bearing on the question of negligence in a subsequent change back to the lever.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 918–927; Dec. Dig. § 270.*]

8. DEATH (§ 86*)—DEATH OF SON—DAMAGES FOR LOSS OF CONTRIBUTION AFTER MAJORITY.

Under the Pennsylvania act of 1855 (P. L. 309), authorizing parents to recover for the wrongful killing of their minor children, they could not recover for loss of expected contributions by deceased after he would have attained his majority.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 112–119; Dec. Dig. § 86.*]

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Action by August Deninger and another against the American Locomotive Company. Judgment for defendant, and plaintiffs bring error. Reversed, and judgment ordered on verdict for plaintiffs for a specified sum.

---

The following is a photograph of the machinery in question:

R. T. M. McCready, for plaintiffs in error.

D. A. Reed (Smith, Shaw & Beal, of counsel), for defendant in error.

Before GRAY and LANNING, Circuit Judges, and McPHERSON, District Judge.

GRAY, Circuit Judge. Suit was brought in the court below by the plaintiffs in error, under a statute of the state of Pennsylvania (Act April 26, 1855 [P. L. 309]) which provides that the "persons entitled

to recover damages for any injury causing death, shall be," among others, the "parents of the deceased."

The statement of claim avers that the plaintiffs' son, August Deninger, Jr., aged 20 years and 5 months, was, at the time of the injury thereinafter stated, and had been for a long time prior thereto, employed by the defendant as an apprentice in the defendant's locomotive works and machine shop, in the Western District of Pennsylvania, and was then and there learning the trade of a machinist, as such apprentice, in the charge and under the instruction of the defendant. That it was the duty of the defendant, under the circumstances, to provide said apprentice at all times with a safe place in which to work and safe and proper machinery, tools, and appliances with which to work as well as to use due and proper care in the instruction of said apprentice in his duties and in the use of the machinery with which it was his custom to work, and to protect him from injury in his said employment. The defendant is then charged with having disregarded its duty in this behalf, and negligently allowing the machinery with which said apprentice was required to work, and the place of said apprentice's employment, to be improper and unsafe, and to become out of repair and in an unsafe condition. That, as a result of the negligence so charged, said apprentice was struck and instantly killed by a part of the machinery with which he was working with due care on his part.

The material facts disclosed by the record sent up with the writ of error, are as follows:

Plaintiffs' son, August Deninger, Jr., a minor within seven months of his majority, as stated by the plaintiffs, and employed as an apprentice by the defendant, was instantly killed December 14, 1907, by having his skull crushed by the accidental revolution of a steel hand lever, 4½ feet long, which was one of a number of levers upon a frame slotting machine, at which he was employed in the shops of the defendant. This machine was a very large and complicated one, and had recently been installed in the defendant's shop in place of one of less size and power. Machines of this character were used to cut slots in the heavy steel frames of locomotive engines. This operation required great power for driving the tool through the heavy steel material, and great accuracy in the adjustment of the cutting tool. This made necessary the complicated machinery spoken of, as well as the great weight of the machine which was said to be about 65 tons. It is difficult to appreciate the situation created by this ponderous machine for those who operated it, without the photographs and diagrams presented at the hearing of the case.

It appears that there were three of these slot cutting machines installed and grouped together, to be operated at one time upon the long steel locomotive frames that were to be slotted at different parts thereof. These machines were run by electric power, and the so-called feed wheel that communicated, by its backward and forward motion, the up and down movement of the heavy cutting tool that cut the slot in the steel frame, had imparted to it this reciprocating motion by certain dogs connected with a rocker arm near the upper part of its periphery. Near the lower part and at one side of this feed wheel,

a fixed shaft extended outward and parallel to the axis of said wheel for a short distance. On this shaft was a sleeve, so fitted as to revolve easily around it. To the inner end of the sleeve, a small pinion wheel was so attached as to revolve with the sleeve. By moving this sleeve forward or backward, the pinion might be engaged or disengaged with the cogs of the feed wheel. The purpose of this arrangement was that, when the power was not being used to move the cutting tool in the direction of an, additional cut in the material, upon which it was being operated, it might be moved, for the making of slighter cuts. with greater accuracy than could be done by the rocking motion of the feed wheel. This was accomplished by placing a hand lever on the end of the sleeve, with means for attaching it to the sleeve, so that the operator could, by moving this lever, move the sleeve and therefore the pinion, when in engagement with the feed wheel and thus regulate with greater nicety the size of the cuts made by the cutting tool. This hand lever was about four and a half feet long and hung down normally from the end of the shaft, so that the shaft and sleeve must have been something more than four and a half feet from the ground. The lever at its upper end had on it a collar which slipped over the shaft and the movable sleeve. It was so constructed as to fit loosely enough not to move or revolve with the sleeve, unless an attachment was made thereto. This attachment consisted of a pawl with two arms in the collar of the lever, which oscillated on a pin, and either arm could be pushed into a ratchet on the sleeve, thereby so attaching the lever to the sleeve that one who held the lever could move the sleeve thereby. As the pinion was so much smaller than the feed wheel, it is obvious that when this lever, in engagement with the sleeve, was moved by hand, backwards or forwards, the pinion engaging the feed wheel produced a movement of the latter in a very small arc of its circumference. But if, when the feed wheel should be in engagement with the pinion, power should be applied by the rocker arm to give the comparatively large reciprocating motion to the feed wheel, the revolution of the pinion and sleeve caused thereby might be many times multiplied, and the consequent revolution of the hand lever, if it happened to be in engagement with the sleeve, would necessarily be of the terrific velocity testified to by the witnesses. Each of these three groups of slotting machinery was equipped, in addition to the shaft, sleeve, pinion, and hand lever, just described, with two other levers, further along but adjacent thereto, called power levers, and the operator at each of these groups was required to regulate the power by these levers as well as, when the power was off, to bring the pinion into engagement with the feed wheel, by pulling the sleeve forward and adjusting the handle bar so as to be in engagement therewith, for the purpose of so moving the pinion as to make the more delicate cuts by the cutting tool, as occasion required. When this operation was through, the operator was required to push the sleeve back, so as to move the pinion out of engagement with the feed wheel before turning on the power.

It therefore appears from the evidence, that the operator, standing in front of one of these cutters, had devolved upon him a duty requiring constant attention to control the power of the feed wheel, as com-

municated by the rocker arm to the feed wheel, by the levers on his left, and, as occasion required, to bring the pinion into engagement with the feed wheel, having been careful to turn the power off before doing so, then to place the collar of the lever arm in engagement with the sleeve, for the purpose of moving the feed wheel by the pinion attached to the sleeve.

The evidence shows that this machine, which, as we have said, replaced a smaller and less powerful machine, was built for the defendants by an experienced and reputable firm engaged in the business of making such machine tools. The head draughtsman of this concern, one Wray, testified that he had had charge of the designing of the machine in question. It had been in testimony that in other machines prior to the use of the one in question, this sleeve and pinion had been worked and controlled by a wheel about 27 inches in diameter. Having been asked,

"Will you state why the levers were used on the heads, for the purpose of using the machine by hand, instead of some other device?"

This witness said:

"Well, a lever device is a very good device in the first place, in connection with the hand levers which I have heard mentioned here this morning; we figured on a hand wheel, thinking it might be advisable, but were forced to give it up on account of the high rotative speed. We were afraid that the hand wheel, at the highest speed that it would be revolved, would burst. It would revolve somewhere in the neighborhood of 18,000 feet a minute, if the hand wheel was made equal to the diameter of the radius (sic) of this lever—with such speed as it would be necessary to use it."

Whatever may be meant by "the highest speed that the hand wheel would be revolved," or by "with such speed as it would be necessary to use it," it gives some notion of what would happen, in the opinion of this witness, if the hand lever, under the same conditions, were revolved instead of the hand wheel. He also testified that hand wheels were sometimes geared on to the mechanism, and revolved every time the machine moved lengthwise, and sometimes they were loose on the sleeve and revolved only when they were in mesh. It does not appear from this evidence, or any other, why a wheel of convenient size, even if necessary to be moved with the application of more power, could not have been used on a sleeve to which it was not attachable by a rigid gear, so that, unless so attached, it would not revolve when the sleeve revolved. Certainly the revolution of a wheel of less radius than the hand lever, accidentally immeshed with the sleeve, if dangerous at all, would be much less dangerous than the wildly revolving lever accidentally immeshed with the revolving sleeve. It is hard to conceive a more dangerous place than would be created by this death dealing hand lever, if it should be engaged with the sleeve while the sleeve was revolving.

The extraordinary danger that would ensue from such an occurrence, seems to have been recognized by the designer of the machine, because he testifies to an automatic safety device in the shape of a hand grip at the handle end of the lever, which, when grasped by the operator, pushed up a rod in the hollow interior of the lever, that was connected at its upper end with the pawl that, through the collar,

engaged the ratchet on the sleeve. This device was so arranged that, when the handle of the lever was grasped by the operator, it necessarily pressed the spring or projection connected with the rod, and thereby pushed the pawl into working connection with the ratchet on the sleeve. When pressure of the hand was released, the weight of the rod and pressure of the spring were sufficient to pull the pawl down out of engagement. If such a device was in working order, it would seem impossible that an accident could ever happen by the violent swinging of the lever when the pinion should become engaged with the feed wheel, as the sleeve would in such cases revolve harmlessly within the collar on the upper end of the lever. Such a device properly adjusted, and kept in working order, would absolutely insure the operator against such an occurrence as admittedly caused the death of the deceased.

It is in evidence that the deceased had worked in the shops of the defendant since he was 14 years of age; that when he was about 16 he became an apprentice in the machine shop, and worked steadily and industriously up until the time of his death; that the machines in question were installed about six months prior to his death, and that for several weeks, he had assisted the operator at one of these machines. It is in testimony that of the prior operators, two had had their arms broken and one was killed, all by the revolution of the hand lever which afterwards killed the deceased in this case.

One Cooper, the shop engineer of defendant, while testifying that it would take a wheel 54 inches radius, or the same radius as the length of the hand lever, to work as easily as the hand lever would, and that a much smaller wheel took all his strength to use it, also testified as follows:

"Q. Well, they have operated this very head hundreds of times with a wheel, haven't they?

"A. I don't know.

"Q. You have seen it operated hundreds of times with a wheel?

"A. Yes, sir.

"Q. What size wheel?

"A. About 26 inches.

"Q. *Diameter* or *radius?*

"A. *Diameter.*

"Q. Instead of 50 some inches *radius?*

"A. Yes, sir."

And Wray, the head draughtsman and designer of the defendant company, testified as follows:

"Q. It was testified by Mr. Cooper that this head was operated hundreds of times with a wheel 26 inches in diameter. How do you account for that, as against your opinion of a 7-foot wheel?

"A. Well, probably on account of the fact that, after a machine has been in use, all the parts would loosen up considerably, and the bearings are in very much better shape. Of course the machine must be designed to operate at first; and for that reason, we have to use a larger lever than it would require after the machine is broken in."

One Bankowitch, a workman employed by the defendant, was called by the defendant and testified that he was then, January 11, 1909, working at the defendant's frame slotter machine, and had been so

working for about two years. He testified to having been injured by the same lever that killed the deceased in this case, and was laid off in consequence about six weeks. His injury occurred prior to the death of Snyder (another workman killed by the same lever) and of Deninger. He returned in January, after these accidents. He testified as follows:

"Q. After you came back to work, did they use these levers?
"A. They did not.
"Q. That was after they put the wheel on, was it?
"A. Yes, sir."

And on cross-examination:

"Q. When you came back in January, they were using a wheel instead of this lever?
"A. Yes, sir.
"Q. And have been using a wheel ever since?
"A. Yes, sir."

Such evidence, though sometimes objected to, when offered by the plaintiff, was here introduced by the defendant and cannot be entirely ignored as bearing upon the question of the change from a comparatively safe to a more dangerous appliance.

Much reliance is placed by the defendant upon the fact that, after the death of Snyder, and the injury of the two other employés, a clip, which was simply a piece of sheet iron bent in a half circle shape, so as to clasp the shaft, was placed thereon, its length extending from the boss on the end of the shaft to the end of the sleeve when the pinion thereon was pushed back out of engagement with the feed wheel, thus preventing, while in position, any possibility of the pinion being jarred into engagement with the feed wheel while in motion. One Clise, who had worked on this machine just before the deceased was put in charge, and whose arm was broken by the accidental revolution of the lever, testified that the shaking off of the clip, by the vibration of the machinery, was liable to occur, though he had never seen this happen and there was no other testimony that it ever had happened. This clip, of course, was to be placed upon the shaft every time the pinion was pushed back out of engagement with the feed wheel, and the defendant strenuously contends that it was the duty of the deceased to use this sleeve protecting device, and that when it was so used, no accidental and dangerous movement of the lever could occur. The defendant's superintendent seemed to think that the use of this clip device, after Snyder had been killed and the other two workmen injured, would make the machine what he flippantly called "fool proof."

As has been shown, the only use of the hand lever and of its being brought into engagement with the sleeve, was when, the power being off the feed wheel, the sleeve with the lever on its end, was drawn out to the end of the shaft, in order that the pinion might engage with the feed wheel, which could then be moved by the hand lever shorter distances for thinner cuts than could be made by the power communicated through the rocker shaft. The danger was in the power not being turned off, or in coming on after it was turned

off, while the pinion was in engagement with the feed wheel and the lever was in operative connection with the sleeve. It is true that, if when the sleeve was pushed back, so as to take the pinion out of engagement with the feed wheel, the clip was placed and kept upon the shaft, the sleeve, and therefore the hand lever if it happened to be in engagement therewith, could not be revolved. It was necessary, however, in order to use the hand lever for the purpose for which it was provided, that the sleeve should be drawn forward, so that the pinion would be in engagement with the feed wheel. If, while the lever was in engagement with the sleeve, the power should be accidentally turned on, the lever would be swung around through the space in front of the machine with the frightful velocity described in the evidence. It was presumably to guard against such a happening, that the automatic appliance above described, by which the pawl in the top of the lever could only engage with the ratchet on the sleeve when the operator had hold of the handle, was devised. At all other times, the pawl was kept normally out of such engagement by the weight of the rod and the pressure of the spring on the handle. As the size of the collar at the upper end of the lever was such that the sleeve could easily revolve within it, and could not actuate or be actuated by the lever unless the pawl in the upper end of the lever was in engagement with the ratchet therein, the automatic device for so engaging it would seem to have been an absolute protection to the operator, if said device was kept in working order. It mattered not, so far as the danger of the operator was concerned, whether the sleeve was revolved by the power driven feed wheel accidentally or intentionally, because the hand lever, unless grasped in the manner described by the operator would remain out of engagement with the sleeve, which would harmlessly revolve within the collar at its upper end. It is in evidence that this automatic safety device was on the machine when it was installed, and that the former accidents, resulting in death and injury to the operators, were possibly occasioned by the said device being out of order. Clise, the last operator who used it, requested that it be removed, because it was in the habit of sticking in the handle, and thus becoming incapable of efficient use. It was accordingly removed by the defendant, on the recommendation of Clise, just before the deceased was placed in charge of the machine. It cannot be denied that the danger of the place in front of the machine was enormously increased by the absence of a properly working safety device, such as has been described. There is no evidence to show that it could not have been so repaired and adjusted as to have properly and continuously performed its function. Nor is there any evidence to show that there was any attempt made by the defendant to so repair it as to secure its safe operation. It was simply removed, and the situation then was, that every time the lever was to be used for its proper purpose, the operator was obliged to use his fingers at the upper end of the lever to move the pawl into engagement with the ratchet, where it would remain until he used his fingers to pull it out of engagement. Here, then, was another call upon his attention, in addition to others, which the dangers of the place exacted from the operator. The question at once

arises, was it a necessary or reasonable addition? Must not an employer, to reasonably live up to his primary duty in this respect, consider a situation which might be called extraordinary, and protect where he can protect, by using the care required by such situation, an operator from dangers to which he may be exposed by reason of inadvertence or distractions which may happen to men of average intelligence and prudence?

Can it be said that, in view of the foregoing facts, the defendant had used all the care that was incumbent upon it to use, in order to render the place in which the deceased was required to work, reasonably safe? To use that degree of care was the primary duty imposed by law upon the defendant—a duty not to be avoided, and the responsibility of which could not be delegated. We think there was evidence, sufficient at least to go to the jury, as to whether the defendant had not fallen short of the degree of care required of it in the premises, by removing the automatic safety device operating, as described, in the handle and collar of the lever. The evidence shows, and it is admitted by the defendant, that the deceased came to his death by having his skull crushed by the revolution of this hand lever. The pinion was then in engagement with the feed wheel, and the power must have been communicated from it to the pinion and sleeve to make the latter revolve. But this accidental revolution of the sleeve would not have caused the hand lever to revolve, unless the pawl thereon had been engaged with the ratchet on the sleeve. It was equally clear that this could not have been the case, if the automatic safety device had been attached to the hand lever and in working order.

It is true, that by constant and unremitting attention to those precautions which it is to be assumed he knew were necessary, the danger might have been avoided; but can a place and situation in which a servant is required to work be said to be reasonably safe, where possibly excusable distraction of the operator's attention may cause the omission of some precaution necessary to his safety, and where the penalty of such omission is instant death or serious bodily harm? In the present case, it seems to be established by the evidence that the deceased apprentice was fairly well acquainted with the operation of this large and dangerous machine, that he was intelligent, industrious and faithful in the discharge of his duties, and there is a presumption that on his part he was in the exercise of due care at the time of the accident. It is true that the presumption of due care also obtains in favor of the defendant; but in this case, the question is, whether that presumption has been rebutted by the evidence of the situation allowed by the defendant to exist. So serious a danger undoubtedly demanded from the defendant serious consideration and attention, and the evidence fairly raises, we think, the question for the jury, whether, under all the circumstances the duty imposed by the law to make reasonably safe the place in which the deceased was required to work, has been properly performed by the defendant.

The defendant, however, relies strongly upon the proposition that the risks of the situation were all known to and appreciated by the deceased, and therefore assumed by him as risks of his employment.

Certainly this is true of the ordinary risks inherent in the employment, but it is not true of a risk or danger arising from the default of the defendant. Whatever the risks assumed by a servant in entering upon his employment may be, the one risk he does not assume, is that arising from the negligence of his employer. Whether the servant in a given case has contributed, by his own negligence, to the negligence of the master, in causing the injury complained of, is another question, to be determined against him only by evidence sufficient to rebut the presumption of due care on the servant's part. It will be a question for the jury to say whether the deceased is to be considered in fault and to have contributed to the accident causing his death, because, while standing in front of this powerful machine, compelled to operate the levers controlling the power on the one hand, and on the other, to watch with unremitting attention the combination of the hand lever with the sleeve and pinion, and to take the detailed precautions necessary to avoid the dangers we have spoken of, he may have omitted, in a moment of inadvertence or distraction, some one of the precautions necessary to his safety.

The law deals with men in their various relations in life, as endowed with average intelligence and capacity, and recognizes their limitations, and that under certain circumstances, inadvertence and distraction may be excusable, where under other circumstances they would constitute a serious default. If, then, the absence of the automatic safety device, which in efficient operation would have prevented the accident, was due to a want of reasonable care on the part of the master, the risk arising from its absence was not one of the risks assumed by the deceased in entering upon his employment. Though this risk, arising from the negligence of the master, was not thus assumed, yet it is true that, if the deceased was aware of and appreciated the danger therefrom he might, by his own negligence in exposing himself thereto, have contributed to his injury, and thus debarred himself from recovery. But there is no affirmative proof of such negligence on the part of the plaintiff, and no fact referred to. from which such negligence can be properly inferred as a matter of law. The facts and testimony bearing upon the question were however submitted to the jury with proper instructions by the court below.

In considering, on the evidence, the question as to how far the primary duty of the master was performed, in providing the safe place in which to work and the safe appliances with which to work, it must be remembered that there was no compulsion on the defendant to use this dangerous hand lever in the operation of its machine. There was testimony before the jury, to be given such weight as they determined justly attached to it, that these levers were first used in these new and large machines; that this very head had been frequently operated with a wheel of moderate size, and that it has been so operated ever since the accident. Obviously, the use of the wheel for the purpose that the lever was used for, would have avoided all the dangers attending upon the latter. The mere fact that it required more power to move a wheel of moderate diameter, would not necessarily excuse the defendant from adopting it, in view of the tragic

experience in its own shops with the hand lever. No mere economy, pecuniary or otherwise, can excuse a master from the performance of the primary duty imposed upon him to make a reasonably safe place in which his servant is to work.

This case was submitted to the jury by the learned judge of the court below, and with this evidence all before it, it found a verdict in favor of the plaintiffs. A motion for peremptory instructions for the defendant was denied by the court, and after verdict, motion for a new trial and for judgment, *non obstante veredicto,* was made by the defendant, which latter motion was granted by the court, and a judgment entered accordingly. We think this case should not have been so disposed of, and that there was evidence sufficient to go to the jury and to warrant the verdict rendered.

The suit in this case was begun February 27, 1908, and after the case was at issue, and just before the jury was drawn, to wit, on January 8, 1909, by leave of the court, the plaintiffs filed the following amendment and supplement to their statement of claim:

"*First.* By reason of the wrongful acts of the defendant, the plaintiffs were caused expenses in and about the burial of their said son in the sum of three hundred and twelve dollars, for which they claim a recovery.

"*Second.* The plaintiffs' said son, August Deninger, Jr., was a source of profit and advantage to the plaintiffs otherwise than from his wages earned in the services of the defendant.

"*Third.* From the condition and situation of the plaintiffs, the condition, situation, character, health, habits, acts, statements and promises of their son, and the other conditions and circumstances of their relationship the plaintiffs had a reasonable expectation of pecuniary profit and advantage from the continuance in life of their said son after his arrival at the age of twenty-two years, and throughout the whole of the remainder of his life time and of the lives of them and each of them, as well as from his continuance in life up to the age of twenty-one years.

"Wherefore the plaintiffs ask damages as aforesaid."

The making of this amendment was objected to by counsel for the defendant, on the ground that it constituted a new cause of action, and as such was barred by the statute of limitations. This question, of course, is not raised in this writ of error, or in the assignments made under it. We think, however, the discretion of the court below was properly exercised; that the amendment related to the same cause of action, to wit, the negligence of the defendant, and sought only to amplify the ground upon which damages were claimed, if indeed such amplification was necessary in view of the ground laid by the original statement of claim in that behalf.

In the view here taken, it is unnecessary to consider the other assignments of error, in relation to the admission or rejection of testimony. It will be necessary, however, to advert to the objection made to that portion of the verdict which awarded damages accruing after the minority of the decedent.

Under the instructions of the court, the jury separated their verdict into "Damages by reason of funeral expenses, $250. Damages during minority of decedent, $310. Damages after minority of decedent, $3,000"—making the total damages $3,560.

It is contended by the defendant that, under the decisions of the Supreme Court of Pennsylvania, the act of 1855 (P. L. 309), by

185 F.—3

which "the persons entitled to recover damages for any injury causing death, shall be * * * parents of the deceased," has been so interpreted as to confine the recovery, in case of a suit brought for injuries resulting in the death of a minor child, to such damages only as accrued during the minority of such child, and arising out of the legal right of parents to its services, and that it is not permissible to recover damages founded upon a just expectancy of such services or pecuniary aid being voluntarily continued after minority. And that this is so, notwithstanding the fact that it is established by the Supreme Court of Pennsylvania that, under the act of 1855, suit may be brought by parents for damages resulting from the injury to an adult child, where the evidence shows that, from the conduct and declarations of such child, in recognition of the parental relation, there is a just expectancy of continued pecuniary assistance and services during a reasonable period in the future; which also has been recognized by this court in the case of Scofield v. R. R. Co. (C. C. A.) 161 Fed. 911, as the law of Pennsylvania.

It is evident, we think, that some difficulty exists in justifying the application of these varying rules to measure the damage in actions to recover for the death of a child. If the family relation exists at all—either by operation of law or by the conduct of the parties— and if there is a reasonable expectation of its continuance, the proposition might be easily supported that compensation can only be adequate when it redresses the actual injury to such expectation. What may be the value of the expectation, will of course depend upon the circumstances of each case. If the child be a minor and the evidence establishes satisfactorily an intention on his part to continue to support his parents, they suffer an injury by his death which is not fully redressed if recovery be confined to the value of his services during minority. To illustrate by an extreme case: If a child, intending to continue the family relation and to support his parents after he shall come of age, be killed immediately before attaining his majority, the amount of damage will be negligible; but if he be killed immediately afterwards, the amount would certainly be increased, perhaps largely increased, while all the other circumstances remain precisely the same. Nevertheless, it is possible to draw a distinction between the two situations, and in our opinion the Supreme Court of Pennsylvania has thus interpreted the act of 1855, as a brief review of the decisions will show.

The first case on the subject is Pennsylvania Railroad v. Kelly, 31 Pa. 372. The action was for injuries, and the trial judge instructed the jury that the damages must be compensatory merely, and that compensation must regard the loss of services and the expense of nursing and professional treatment. The Supreme Court approved these instructions, saying:

"These were the grounds on which the father claimed damages in his declaration, and they were the appropriate grounds on which to assess them. The father was entitled to the services of his child during minority, and by just so much as this injury impaired the value of that right, was he entitled to compensatory damages. This was the only action he could ever maintain, and all his damages were to be assessed herein. For surgical at-

tention and nursing, he was also entitled to compensation on the general principle of *quantum meruit.*"

And the judgment was reversed because these instructions were lost sight of elsewhere in the charge, the jury having been told that there was no absolute measure of damages, and that such a verdict might be given as they believed to be right to compensate the plaintiff for the loss and injury sustained. This instruction was criticized as follows:

"But when such a disaster occurs from a merely negligent performance of customary duties, and involves no malicious motive whatever, the rule of law is that the father is entitled to compensation merely for the pecuniary loss he has sustained. Not compensation for his lacerated feelings or his disappointed hopes, for the law cannot compensate these in money, but pecuniary indemnity for pecuniary losses. What he spent to cure his boy, and what profit might have accrued to him from his services, more than can be realized after the injury, are the proper elements of a verdict."

In Pennsylvania Railroad v. Zebe, 33 Pa. 318, a suit for death, the act was again considered. The court said that the statutory right given to the parents was new and independent, given by positive law, and not cast upon them by survivorship as for an injury to the decedent. It was for the wrong done to the parents, and the measure of damages in the case of death resembled the measure in the case of injury. Pennsylvania Railroad v. Kelly was referred to, and the court added:

"This is a rule of damage on a very kindred subject, and is scarcely distinguishable from cases like the present, except in extent of injury, and is, in essence, the principle of the cases already cited. From the authorities and reasons given, the jury, instead of the unrestrained license given them in the charge, in the assessment of the damages, should have been instructed that, if the plaintiffs were entitled to recover, it was for the damage done in producing the death of the son, and that this was to be estimated by the pecuniary value to them of his services during minority, together with expenses of care and attention to the deceased, arising out of the injury, funeral expenses and medical services, if any. This is the only pecuniary damage done to them, and this the law allows them to recover, if entitled on the facts to recover at all."

In Caldwell v. Brown, 53 Pa. 453—also an action for death—the trial judge charged that:

"The measure of damages is simply the money value of this boy's services until he arrive at 21 years."

He refused the following point:

"The measure of damages is not to be confined simply to what wages the deceased might have earned during his minority, but may also include the advantage of his society and assistance at home out of active labor hours; and also the contingency of his remaining at home and laboring for his parents after he attained his majority, as well as the aid they might reasonably expect from him in their old age, even if he married."

Saying:

"It is the pecuniary value of the services of the boy alone during his minority that can be recovered."

The Supreme Court approved these instructions as "clearly the law and a proper answer to the instructions prayed for," citing Railroad v. Kelly and Railroad v. Zebe.

Lehigh Iron Co. v. Rupp, 100 Pa. 95, was also an action for death. The court said:

"The damages recoverable are for the injury to the relative rights of the surviving members of the family, and are compensatory in all cases except when there is a bad motive, or circumstances of aggravation, which would justify punitive damages. If the child was free by age, or emancipation, and living apart from his parents, and in no way contributed to their support, they could not maintain an action, for they suffered no pecuniary loss, and the family relation had been dissolved to the extent of actual separation. But although the child was of full age, if the family relation existed in fact, and the parents had a reasonable expectation of pecuniary advantage from him, they can maintain the action"

—citing Railroad v. Adams, 55 Pa. 499, and Railroad v. Kirk, 90 Pa. 15, which will be referred to in a moment.

"In an action for loss by death of a minor child, the parents can recover only the value of his services during minority; Caldwell v. ·Brown, 53 Pa. 453. The chances of survivorship, his ability and willingness after he should become of age to support others, are matters too vague to enter into an estimate of damages merely compensatory."

And the court went on to declare that, while the widow or children of the deceased are entitled to damages based upon his life expectancy, the rule was different when a parent was suing for the death of a minor child:

"Notwithstanding the repeated decisions that, for the death of a minor child, the parents can only recover the value of his services during minority, in addition to the expenses caused by the injury and death, the court instructed the jury to estimate the damages by the rule applicable in case of suit by the widow or children, and inasmuch as the Iron Company had settled with and satisfied the widow, the verdict should be for one-half the estimated damages."

In Palmer v. Railroad Co., 218 Pa. 114, 66 Atl. 1127, it was decided that parents could not recover exemplary damages for the death of a minor child. This was the point of the decision, but the opinion refers with approval to Railroad Co. v. Kelly, Railroad Co. v. Zebe, and Caldwell v. Brown. These cases were followed in Esher v. Railroad, 28 Pa. Super. Ct. 393, a decision of the Superior Court (which is a court of intermediate appeal), where it was again decided that the measure of damages for the death of a minor child is the expense incurred by the parents by reason of the minor's death, and also the net value of his services during minority.

These decisions lay down a direct and positive rule, in the case of a minor. If, however, the child be an adult, a different measure is applied. In Pennsylvania Railroad v. Adams, 55 Pa. 499, where the child was 26 years old, it was decided, following several English cases:

"That if there be a reasonable expectation of pecuniary advantage, the destruction of such expectation by negligence occasioning the death of the party from whom it arose will sustain the action. This is the settled rule in England for the right of recovery where the family relation exists in fact but not in law, so far as maintenance or support is concerned."

The court then refers to the case of a minor, saying:

"What we said in Railroad v. Zebe, 33 Pa. 318, is entirely consistent with these views. We were there speaking of a case in which the suit was for

occasioning the death of a minor. The legal right to his services was in the plaintiffs, at least in the father, when the accident occurred; and upon that right the plaintiffs' recovery was allowed. It could not be known whether he would continue the relation after he came of age or not, and as that ground of recovery was not before us, we referred only to that which was. In the case in hand the recovery was not upon the legal right to services, but upon an expectancy resulting from the voluntary continuance of the family relation, and the expectation of the continuance of the support already given. Quite a different principle. This case does not aid the plaintiffs in error in the least."

North Pennsylvania R. R. v. Kirk, 90 Pa. 15, was also the case of an adult son, and was decided without discussion, on the authority of Railroad v. Adams. To the same effect is Blauvelt v. Railroad Co., 206 Pa. 141, 55 Atl. 857. In this circuit, Scofield v. Pennsylvania Co. (C. C.) 149 Fed. 601, was the case of an adult son, in which Judge Archbald refers to the two lines of decision, saying:

"It is difficult for me to reconcile these opposite and seemingly contradictory positions"

—and following Railroad v. Adams and Railroad v. Kirk. His decision was affirmed in 161 Fed. 911, this court saying that no error had been committed in following the construction given to the act of 1855 by the Supreme Court of Pennsylvania:

"That court has held that the existence on the part of plaintiff of a reasonable expectation of pecuniary benefit from the deceased, and not necessarily support and maintenance, was the ground of recovery under the statute. This construction of the statute, first announced in Penna. R. R. v. Adams, 55 Pa. 499, has been followed in later cases," etc.

We are bound by the Pennsylvania decisions, and are therefore constrained to hold that so much of the verdict as awards damages beyond minority cannot be sustained.

The judgment is reversed with costs to the plaintiffs in error, and the Circuit Court is directed to enter judgment on the verdict for $560.